In re Alberto Obed MIERA, Jr., Debtor.

Molly T. SHIELDS, Trustee of the
Bankruptcy Estate of Alberto
Obed Miera, Jr., Plaintiff,

v.

Alberto Obed MIERA, Jr., and Carla R.
Miera, Defendants.

Bankruptcy No. 3–88–1897.
Adv. No. 3–88–203.

United States Bankruptcy Court,
D. Minnesota,
Third Division.

Sept. 12, 1989.

Molly T. Shields, Peterson, Franke & Riach, St. Paul, Minn., for plaintiff.

Ronald J. Walsh, Levy & Miller, Minneapolis, Minn., for defendants.

## ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

GREGORY F. KISHEL, Bankruptcy Judge.

This adversary proceeding came on before the Court on June 21, 1989, for hearing on Defendants' motion for summary judgment. Defendants[1] appeared by their attorney, Ronald J. Walsh. Plaintiff–Trustee Molly T. Shields appeared *pro se.* Upon the moving and responsive documents, record made at hearing, the other files and records in this adversary proceeding, and certain facts and events judicially noticed from other state and federal court proceedings involving Debtor, the Court denies Defendants' motion.

In this adversary proceeding, the Trustee of Debtor's bankruptcy estate seeks a judgment avoiding Debtor's pre-petition transfer to Carla Miera of an interest in real estate as a fraudulent conveyance under 11 U.S.C. § 548(a)(1). She also seeks a judgment denying Debtor his general discharge in bankruptcy because of that transfer, pursuant to 11 U.S.C. § 727(a)(2)(A). Certain basic facts are uncontroverted, either by way of Defendants' admission, because they are a matter of public record, or because of Defendants' failure to adduce evidence to establish a genuine issue of material fact as to them.

### FINDINGS OF FACT

Debtor filed a voluntary petition under Chapter 7 of the Bankruptcy Code in this Court on June 13, 1988. At all times relevant to this adversary proceeding, Debtor was a judge of the Minnesota State District Court for the Second Judicial District, Ramsey County. He is a law school graduate and had been a practicing lawyer for a number of years before his appointment to the bench in 1983. Carla Miera is his sister. She apparently has lived with Debtor for several years.

For several years before May, 1988, Debtor owned and occupied a homestead located at 956 Birchview Court in St. Paul. He had been the sole holder of record title since his divorce in November 1986. In his bankruptcy schedules he stated the value of the homestead at $152,000.00, and noted a first mortgage against it securing a debt in a stated balance of $80,000.00. The homestead apparently is subject to a dissolution lien in favor of Debtor's ex-wife. The precise nature and amount of the debt this lien secures are not clear from the record. Debtor claimed his homestead interest exempt pursuant to Minnesota statute.

During the spring and early summer of 1988, Debtor was the subject of considerable public controversy. His former court reporter had obtained a substantial judgment against him in a tort and employment discrimination lawsuit. Cross-appeals from that judgment were pending in the Minnesota Court of Appeals.[2] Garnishments made to collect on that judgment had attached a portion of Debtor's salary on several occasions. As a result of the allegations made in the lawsuit, and certain other

---

1. Further references to the individual defendants shall be made as follows: "Debtor" for Alberto Obed Miera, Jr. and "Carla Miera" for Carla R. Miera.

2. These appeals resulted in the opinion in *Johnson v. Ramsey County,* 424 N.W.2d 800 (Minn. App.1988), *rev. den.* (Minn. August 24, 1988). *See also In re Miera,* 104 B.R. 150 (Bankr.D. Minn.1989).

allegations, the Minnesota Board on Judicial Standards had filed a formal complaint against Debtor in August, 1987, seeking his removal from office. After fact-finding by a three-judge panel, the judicial disciplinary proceedings were pending in the Minnesota Supreme Court in the spring of 1988.[3]

In November 1987, Debtor had filed a petition for relief under Chapter 11 in this Court. The case did not make any cognizable progress toward the proposal and confirmation of a plan of reorganization during the five months in which it remained pending. On March 4, 1988, this Court granted the motion of the U.S. Trustee for dismissal of the case, on the authority of *Wamsganz v. Boatmen's Bank of De Soto*, 804 F.2d 503 (8th Cir.1986).

In early April 1988, Debtor announced through the local news media that he was embarking on a "life-threatening fast" to protest what he described as discriminatory treatment against him in the lawsuit and disciplinary proceedings. He has stated in essence that he expected to die during the course of this fast.[4]

On May 5, 1988, Debtor met with Timothy L. Piepkorn, a Minneapolis attorney whom Debtor had known while both were in law school. Debtor had not had a will or an estate plan before this meeting. As a result of the meeting, Piepkorn drafted a quit claim deed under which Debtor transferred his homestead from his sole ownership into a joint tenancy between himself and Carla Miera. Debtor executed that deed later in May 1988; it was then recorded.[5] Debtor admits that he received no consideration from anyone for the transfer. He also admits that he has retained control and possession of the homestead, though he states that Carla Miera has continued to live there. Piepkorn also prepared a will and various other estate-planning documents for Debtor's later execution.

Debtor's current bankruptcy filing followed within approximately one month. Plaintiff repeatedly continued the Meeting of Creditors in Debtor's case because Debtor's attorney advised her that the fast had made Debtor too weak to attend. Debtor ended his protest after the Minnesota Supreme Court announced its decision in the judicial disciplinary proceedings in early July, 1988.

## DISCUSSION

### I. Issues Presented.

#### A. Relief Requested by Plaintiff.

Plaintiff bases this adversary proceeding exclusively upon the event of Debtor's creation of the joint tenancy in his homestead. The parties do not dispute that this act was a transfer of an undivided one-half interest in the homestead to Carla Miera. Plaintiff asserts that Debtor made that transfer "with actual intent to hinder, delay or defraud" a creditor or his creditors generally, by doing it with the knowledge and intent that it would remove the unencumbered value of his homestead from the assets which would have been subject to probate administration if he were to have died during the course of his protest fast. She points out that in that administration, Debtor's creditors would have been able to file claims against the probate estate. Those claims would have received priority in the distribution of probate assets over the claims of beneficiaries under a will or of his heirs under intestate succession. *See* MINN.STAT. § 525.145(2) (where there is no surviving spouse, homestead descends

---

3. These proceedings resulted in the opinion in *In re Miera*, 426 N.W.2d 850 (Minn.1988).

4. Transcript of Meeting of Creditors in BKY 3–88–1897, conducted on September 20, 1988 before Plaintiff ("Tr. of Meeting of Creditors"), at 29–30 (filed in this adversary proceeding on June 20, 1989). Debtor's precise words were "... because of that fast I did not think the likelihood of my surviving physically was much of a likelihood at all ..."

5. The record reveals a factual dispute as to when Debtor actually signed the quitclaim deed. *Compare* Tr. of Meeting of Creditors at 31, with Affidavit of Timothy L. Piepkorn ("Piepkorn Affidavit"), at para. 8 (filed on June 14, 1989). None of the parties put a copy of the deed into the record for this motion. This discrepancy *may* not be material.

as other real estate), and §§ 524.2–101, 524.3–807 and 524.3–901, *inter alia.*

In her prayer for relief, Plaintiff seeks judgment avoiding Debtor's transfer of the interest in the homestead as a fraudulent transfer under 11 U.S.C. § 548(a), preserving that transfer for the benefit of the estate pursuant to 11 U.S.C. § 551, and then recovering the property or its value from the transferee pursuant to 11 U.S.C. § 550(a). She also seeks to have Debtor denied his general discharge in bankruptcy as a sanction for the making of the transfer, pursuant to 11 U.S.C. § 727(a)(2)(A). She has focused her theory of recovery in the fraudulent-transfer count on the "actual intent" provision of 11 U.S.C. § 548(a)(1).[6] The discharge-objection provisions of 11 U.S.C. § 727(a)(2)(A) contain comparable language requiring a showing of actual intent to hinder, delay, or defraud creditors, on the part of the debtor.[7]

### B. Defendants' Arguments for Present Motion.

Defendants argue that they are entitled as a matter of law to a judgment denying both of Plaintiff's requests for relief. They make two alternative arguments in support.

First, Defendants argue that, as a matter of law, a debtor's conveyance of property, which property is exempt from claims of creditors under state law, does not deprive such creditors of anything to which they would have been entitled otherwise. Un-

der this argument, then, any transfer of exempt property is not a transfer within the ambit of 11 U.S.C. §§ 548(a)(1) and 727(a)(2), even if the debtor was motivated by a desire to frustrate creditors in making the transfer.[8] Because the element of intent is irrelevant under this variant analysis, and because the only factual elements going directly to this argument are undisputed, the issue is purely legal in nature.

In the alternative, Defendants acknowledge for the sake of argument that Debtor's creation of the joint tenancy constituted a transfer actionable under 11 U.S.C. §§ 548(a)(1) and 727(a)(2). They then argue that there is no evidence of record to support a finding that Debtor made the transfer with actual intent to hinder, delay, or defraud his creditors, asserting that Defendants' evidence on the intent issue stands alone and unchallenged. Defendants maintain, accordingly, that there is no genuine issue of material fact as to the non-existence of a necessary element of both counts of Plaintiff's complaint, and that they are entitled to judgment as a matter of law in their favor, denying all of Plaintiff's requests for relief.

### II. Analysis of Defendants' Motion.

#### A. Alleged Absence of "Transfer of Property"

To support their first alternative argument, Defendants have cited a number of federal cases [9] which hold that a debtor's

---

**6.** 11 U.S.C. § 548(a)(1) provides, in pertinent part:

(a) The trustee may avoid any transfer of an interest of the debtor in property, ... that was made or incurred on or within one year before the date of filing of the [debtor's bankruptcy] petition, if the debtor voluntarily or involuntarily—

(1) made such transfer ... with actual intent to hinder, delay, or defraud any entity to which the debtor was ... indebted

. . . . . .

**7.** 11 U.S.C. § 727(a)(2) provides, in pertinent part:

(a) The court shall grant the debtor a discharge, unless—

. . . . .

(2) the debtor, with intent to hinder, delay, or defraud a creditor, has transferred ...—

(A) property of the debtor, within one year before the date of the filing of the [debtor's bankruptcy] petition ...

**8.** At several points, Defendants' counsel mischaracterized the focus of this argument as being on the intent element of §§ 548(a)(1) and 727(a)(2). It is actually on the "transfer of property" element.

**9.** In addition, Defendants cite a number of Minnesota state appellate decisions for the proposition that "[e]xempt property is not susceptible of fraudulent alienation, and creditors ordinarily have no right to complain of the disposition made of it, since they cannot be prejudiced thereby or claim that it is a fraud upon them," as held in *Sisco v. Paulson,* 232 Minn. 250, 251, 45 N.W.2d 385, 387 (1950). Defendants cite *Sisco v. Paulson,* as well as *First Nat'l Bank of Mankato v. Wilson,* 234 Minn. 160, 163, 47 N.W.2d 764, 766 (1951), and *Hentges v. P.H. Feely & Son, Inc.,* 436 N.W.2d 488, 491-92 (Minn. App.1989). *See also Northwest Holding Co. v. Evanson,* 265 Minn. 562, 567, 122 N.W.2d 596,

transfer of property which would have been exemptible [10] from the estate in his ensuing bankruptcy case does not constitute a transfer avoidable under § 548(a), *In re Treadwell,* 699 F.2d 1050 (11th Cir.1983), *In re Weis,* 92 B.R. 816 (Bankr.W.D.Wis. 1988), and *In re Robinett,* 47 B.R. 591 (Bankr.S.D.Fla.1985) [11], and does not support an objection to discharge under 11 U.S.C. § 727(a)(2)(A), *In re Agnew,* 818 F.2d 1284 (7th Cir.1987), and *In re MacDonald,* 50 B.R. 255 (Bankr.D.Mass. 1985).[12]

These decisions are based on the principle of "no harm, no foul." This Court has no quarrel with their general proposition, stemming as it does from certain fundamental precepts of bankruptcy and debtor-creditor law. In fact, that proposition could fairly be seen as a reasonable corollary to several prior decisions of judges of this Court. *See In re Drenckhahn,* 77 B.R. 697, 705 (Bankr.D.Minn.1987), and *In re Clausen,* 44 B.R. 41, 43 (Bankr.D.Minn. 1984) (both holding that only a transfer of property which otherwise would have been distributed to creditors through the bankruptcy estate is subject to sanction under 11 U.S.C. § 727(a)(2)).

■ However—as Plaintiff aptly argues—its configuration of unique (in some aspects verging on bizarre) facts removes

Debtor's case from the scope of the general rule. This ultimately bars a perfunctory dismissal of this adversary proceeding, and mandates entry of a decision only after a full development of evidence on the merits.

The general rule is based on a simple, and sometimes unspoken, recognition that the bankruptcy courts have no business in avoiding pre-petition asset transfers which did not result in actual prejudice to the bankruptcy estate, or in denying discharge to a debtor whose actions could not possibly have denied general unsecured creditors a realization from the bankruptcy estate. *See In re Drenckhahn,* 77 B.R. at 705; *In re Robinett,* 47 B.R. at 592; *In re Agnew,* 818 F.2d at 1289; *In re MacDonald,* 50 B.R. at 258. However, not a one of the federal cases cited by Defendants involves the novel situation of a financially-beleaguered debtor who transferred assets at a time when he expected to die, and to the end that creditors then would have been deprived of the opportunity to reach the property under state-law procedures had the debtor died as expected. This distinction is a crucial one.

Whether one agrees with their analysis and result or not, recent Eighth Circuit decisions applying 11 U.S.C. § 727(a)(2)(A) explicitly focus discharge objections involv-

---

600 (1963) (dicta); *Cysewski v. Steingraber,* 222 Minn. 221, 227–28, 24 N.W.2d 266, 269–70 (1946); *Thysell v. McDonald,* 134 Minn. 400, 403, 159 N.W. 958, 959 (1916); *Keith v. Albrecht,* 89 Minn. 247, 250, 94 N.W. 677, 678 (1903); *Ferguson v. Kumler,* 27 Minn. 156, 161–62, 6 N.W. 618, 620 (1880); *Morrison v. Abbott,* 27 Minn. 116, 117–18, 6 N.W. 455, 455–56 (1880). The holdings of these cases are not binding upon this Court, as they were decided as matters of state debtor-creditor law outside the context of a bankruptcy case. The present adversary proceeding is governed by the federal statutory law of 11 U.S.C. §§ 548(a)(1) and 727(a)(2)(A), and the federal courts' construction of those statutes.

**10.** Under Minnesota law, of course, a debtor's homestead is exempt from claims of general creditors to an unlimited value, subject only to certain acreage limitations. *See* MINN.STAT. § 510.01 *et seq.* Debtor elected the Minnesota state exemptions for the purposes of his bankruptcy case when he filed his Chapter 7 petition.

**11.** Defendants also cite *In re Gingery,* 48 B.R. 1000 (D.Colo.1985), which really focuses on

whether 11 U.S.C. § 522(g) bars a debtor from claiming an exemption in such an asset so transferred, after the court has avoided the transfer at the trustee's instance. It does not address the threshold issue of the propriety of avoidance of the transfer of otherwise-exempt property. It appears that the threshold issue was settled in a prior order of the *Gingery* court, *see* 48 B.R. at 4002, and thus was not in controversy when that court rendered the published decision.

**12.** Because the actionable event under the language of both statutes is a transfer of property interests, and because both statutes overlay a requirement of the same specific intent onto the transfer element, cases decided under each statute may fairly be cited as authority for issues under the other. *See, e.g., In re Weis,* 92 B.R. at 822–23 (applying rule of *In re Agnew*—a § 727(a)(2) decision—to a § 548(a)(1) fraudulent-transfer action); *In re Parameswaran,* 50 B.R. 780, 784–85 (S.D.N.Y.1985); *In re Marcus,* 45 B.R. 338, 342 (S.D.N.Y.1984).

ing pre-petition transfers of assets on the debtor's actual, subjective intent in making the transfers. *See In re Johnson*, 880 F.2d 78 (8th Cir.1989); *Norwest Bank Nebraska, N.A. v. Tveten*, 848 F.2d 871 (8th Cir. 1988); *McCormick v. Security State Bank*, 822 F.2d 806 (8th Cir.1987). For better or for worse, this probably will make the outcome of such discharge objections fact-specific to each and every case. *See Norwest Bank Nebraska, N.A. v. Tveten*, 848 F.2d at 876–77 (affirming Bankruptcy Court's inference as to intent as a finding of fact, under "clearly erroneous" standard of review); *Hanson v. First Nat'l Bank*, 848 F.2d 866, 869 (8th Cir.1988) (similarly affirming Bankruptcy Court's finding on debtor's intent in converting non-exempt to exempt assets as not "clearly erroneous," in context of objection to debtor's claim of exemption in assets in their converted form); *In re Johnson*, 880 F.2d 84 (remanding for factual determination on debtor's "fraud").

Under these decisions, the grant or denial of discharge in cases disputed under § 727(a)(2)(A) may hinge on any of a number of individual factors, which apparently are to be considered as "badges" of an intent to hinder, delay, or defraud creditors: the debtor's making of fraudulent misrepresentations to creditors contemporaneously with a clandestine transfer, *McCormick v. Security State Bank*, 822 F.2d at 808; the value of the property transferred, *In re Johnson*, 880 F.2d at 82, 84; and the asset or ownership configuration which is the end-result of the process of transfer, *In re Johnson*, 880 F.2d at 84 (there, drawing an absolute distinction between conversion of non-exempt assets into exempt homestead, and conversion of non-exempt assets into exempt assets of non-homestead character).

The present case, while at first apparently beyond the pale of § 727(a)(2)(A), shows yet another relevant, if narrow, circumstance which may bear on the question of the debtor's intent: whether the asset, while nominally and actually exempt in the hands of the Debtor at the time of the transfer, would have become subject to claims of creditors upon the future occurrence of specific contingencies were known to, anticipated, and relied upon by the debtor, were the debtor not to make the transfer.

Recognizing this factually-narrow and relatively rare scenario as an event which may support the invocation of §§ 548(a)(1) and 727(a)(2)(A) does not do violence to the general rule cited by Defendants. Exemptions, after all, are conferred by statute to further the social goals of avoiding future hardship to insolvent debtors and their dependents, and lessening debtors' demands on public and charitable funds which might otherwise result from creditors' seizure of assets. *See In re Johnson*, 80 B.R. 953, 962–63 (Bankr.D.Minn.1987), and cases cited therein; *Norwest Bank Nebraska, N.A. v. Tveten*, 848 F.2d at 876, and *In re Johnson*, 880 F.2d at 82–83. However, these social goals are meaningful, and their embodying statutes are worthy of full and unquestioned enforcement, only when the debtor himself expects to, and logically can be expected to, use the exempt property to meet his and his dependents' future needs. The situation is materially different when the debtor, through his own devices, is in a position where he does not expect to physically survive to use his exempt property. Then, it simply does not serve the utilitarian and humanitarian goals of exemption statutes to cloak a possibly-targeted transfer with the impunity which the law otherwise arguably confers upon such actions. Under such circumstances, creditors would have a fair expectancy of realizing from the debtor's assets once they became subject to creditors' claims.[13] The courts should not frustrate that expectancy by honoring the general rule—and should, in fact, focus on the issue which the statutory language makes central: did the debtor make the transfer with an intent so specifi-

---

13. This expectancy of course would be subject to any senior claims of the debtor's statutory dependents under probate or intestacy statutes, such as those creating a right to family-subsist-

ence allowances or a surviving spouse's right to occupy a homestead for life, subject to the claims of remaindermen-heirs.

cally targeted at creditors' interests that the transfer should be nullified and/or the debtor appropriately punished by denial of discharge?

This exception, not coincidentally, also preserves a basic symmetry. In the context of such a bankruptcy case, commenced after the transfer of assets, but before the debtor's death (if death occurs at all), the Court addresses the facts *after* the anticipated contingency has failed, and only when the debtor and the debtor's transferee are attempting to "have it both ways." Recognizing this exception forces the debtor to accept the fact that his prior actions may have negative consequences as well as positive ones. This, in turn, prevents the debtor from having enjoyed only a benefit,[14] or the possibility of a benefit, from an act committed with a proscribed intent. It also prevents the debtor from escaping any of the downside risk otherwise borne by those who commit such acts in more common circumstances. To be sure, this has the effect of hoisting a debtor by his own petard. That result cannot be said to be inequitable, unjust, or against public policy.[15]

It simply is not appropriate to conclude as a matter of law that Debtor's creation of the joint tenancy was not a "transfer of property" for fraudulent-conveyance and discharge-objection purposes. Debtor has testified under oath that he accepted the probability that he would die during his protest. The then-current status of the record title to his sole major asset would

have left that asset subject to claims of creditors in probate administration, had he in fact died. That circumstance created an expectancy of pecuniary realization for those creditors. Though that expectancy certainly was not legally enforceable then or now, it nonetheless is cognizable for the equitable purposes of a bankruptcy proceeding under §§ 548(a)(1) and 727(a)(2)(A). This should be so, if for no reason other than that Debtor then took action which would have had the certain result of defeating that expectancy if he had died during the course of the fast.

Thus, it cannot be said that this was a "no harm, no foul" situation; had the events which Debtor anticipated and relied upon ultimately occurred, his creditors would have been deprived of the simple recourse of filing a claim against his probate estate and sharing in the proceeds of his homestead equity. They may well have been deprived of *any* remedy.[16] For the purposes of Plaintiff's causes of action, there *was* a "transfer of property" actionable under §§ 548(a)(1) and 727(a)(2)(A); Plaintiff may not be denied relief as a matter of law on Defendants' first alternative argument, and the focus of the inquiry then shifts to the intent element.

*B. Alleged Absence of Evidence of "Intent to Hinder, Delay, or Defraud"*

In their second alternative argument, Defendants maintain that the record on this motion contains no evidence whatsoever that Debtor considered the claims and interests of his creditors in creating the

---

**14.** That is, the enjoyment of an expectation that an asset had been removed from the grasp of creditors.

**15.** Defendants argue at length that Plaintiff's theory of recovery "suffers from an ironically fatal flaw ... Debtor's death, a vital and necessary element of [Plaintiff's] complaint, never occurred." As the foregoing discussion makes clear, the fact that Debtor did not die during his protest does not foster a "flaw"; counsel's gallows "humor" (or Freudian-slip pun) aside, this fact is *not* "fatal" to Plaintiff's theory; and, certainly, anyone with some semblance of compassion should fail to see "irony" in any of the facts, or in this line of argument. In any event, though the Eighth Circuit's more recent opinion in *In re Johnson* unfortunately confuses the issue, the mere fact that the transfer of assets did

not achieve its original intended result does not bar a discharge objection based on the occurrence of the transfer. *Norwest Bank of Nebraska, N.A. v. Tveten,* 848 F.2d at 876. Neither should it bar a trustee's proceeding to avoid the transfer.

**16.** *Sisco v. Paulson, supra,* seems to hold that, as a matter of Minnesota state law, creditors of a debtor who transfers exempt property shortly before death have no recourse against the property or the transferee, even where the property otherwise would have passed into the debtor's probate estate. *But see* MINN.STAT. § 524.3–710, enacted since *Sisco v. Paulson,* which explicitly grants the power to avoid fraudulent transfers to the personal representative of a probate estate.

joint tenancy, and, therefore, he could not possibly have harbored the "intent to hinder, delay or defraud" creditors which is a necessary element of Plaintiff's requests for relief under §§ 548(a)(1) and 727(a)(2)(A).

To support of this motion, Defendants have submitted the Piepkorn Affidavit. Piepkorn was the attorney who counseled Debtor as to the transfer of Debtor's homestead into joint tenancy. Piepkorn states that he discussed general estate-planning concepts with Debtor during their May 5, 1988 appointment, and discussed the difference between probate and non-probate assets.[17] He states that he recommended the creation of the joint tenancy to make the homestead a non-probate asset, and that "[t]his was done as an estate planning technique and for no other purpose."[18] He further states that Debtor's "nearly sole concern" during this consultation was the issue of authority to make medical-care decisions for him if he were incapacitated, and the legality of the "living will" that Piepkorn had suggested.[19] He states, "At *no* time did Mr. Miera discuss creditors or give me any indication that creditors would not be paid from his nonprobate estate."[20] Defendants also point to the lack in the record of any damaging admission by Debtor, and argue that there is no circumstantial evidence to support an inference of the proscribed intent.

In response, Plaintiff points to Debtor's status as an experienced attorney and judge. When he started his protest fast, Debtor knew that, if he died, his assets would have to be administered, and then distributed to someone. He obviously was concerned about the issue, and knowledgeable enough from his general legal experience and education, to seek counsel. At his Meeting of Creditors, Debtor evidenced a competent understanding of the nature of a joint tenancy in real estate.[21] During his testimony, he stated that at the time of the

transfer he believed that "a homestead was exempt," and would not have been subject to the claims of his creditors had he not created a joint tenancy.[22] However, when Plaintiff pressed him as to whether he had been "trying to insure that all of [his] assets were disbursed to [his] family as opposed to [his] creditors," he at first failed to answer. When she persisted, he stated "I can't answer that in a yes or no question."[23]

BANKR.R. 7056 incorporates FED.R.CIV.P. 56, and makes it applicable to this adversary proceeding. Upon a motion for summary judgment "[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c).

As the Supreme Court recently reaffirmed, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole . . ." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A party-defendant in civil litigation may move for summary judgment in its favor on the plaintiff's claim, and discharges its initial burden on the motion "by 'showing'—that is, pointing out to the . . . court—that there is an absence of evidence to support the [plaintiff's] case." *Celotex Corp. v. Catrett,* 477 U.S. at 325, 106 S.Ct. at 2554. This attack may be focused on a single essential element of the plaintiff's case. *Celotex Corp. v. Catrett,* 477 U.S. at 322–24, 106 S.Ct. at 2552–53.

In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the [plain-

---

17. Piepkorn Affidavit at para. 2 and 6.

18. Piepkorn Affidavit at para. 6.

19. Piepkorn Affidavit at para. 7.

20. Piepkorn Affidavit at para. 8.

21. Tr. of Meeting of Creditors at 41–2.

22. Tr. of Meeting of Creditors 32–3.

23. Tr. of Meeting of Creditors at 35–6.

tiff's] case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett,* 477 U.S. at 322–23, 106 S.Ct. at 2552. If the plaintiff then does not demonstrate the existence of a triable fact issue by producing probative evidence to support the existence of the element in question, the Court must grant the motion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 160–61, 90 S.Ct. 1598, 1609–10, 26 L.Ed.2d 142 (1970); *First Nat'l Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968).

In determining whether the plaintiff has produced enough evidence to raise a genuine issue of material fact, the trial court applies essentially the same standard as is applied on a motion for directed verdict under FED.R.CIV.P. 50(a). *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250–51, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986). Under Rule 50(a),

> the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. [citation omitted] If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed. [citation omitted]

*Id.* Put another way, "a trial court should grant a motion for a directed verdict only if all the evidence points one way and is susceptible of no reasonable inference sustaining a finding" in favor of the plaintiff. *Tallarico v. Trans World Airlines, Inc.,* 881 F.2d 566, 571 (8th Cir.1989); *Mississippi Lofts, Inc., v. Lexington Ins. Co.,* 841 F.2d 251, 253 (8th Cir.1988).

These recent holdings do not vitiate the longstanding recognition that summary judgment is a harsh remedy, one which a trial court should not grant unless the moving party has established its right to judgment with indisputable clarity and has established that the nonmoving party is not entitled to relief under any discernible circumstances. *See, e.g., Bradsher v. Missouri Pacific R.R.,* 679 F.2d 1253 (8th Cir. 1982); *Keys v. Lutheran Family & Chil-*

*dren's Serv. of Mo.,* 668 F.2d 356 (8th Cir. 1981); *Unlaub Co., Inc. v. Sexton,* 568 F.2d 72 (8th Cir.1977); *Cervantes v. Time, Inc.,* 464 F.2d 986 (8th Cir.1972), *cert. den.,* 409 U.S. 1125, 93 S.Ct. 939, 35 L.Ed.2d 257 (1973).

"[A]t the summary judgment stage, the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 249, 106 S.Ct. at 2510. The court must view all evidence in the light most favorable to the nonmoving party, and must, for the purposes of the motion, draw all reasonable factual inferences in favor of the nonmoving party. *Pierce v. Marsh,* 859 F.2d 601 (8th Cir. 1988); *In re Rolain,* 823 F.2d 198 (8th Cir.1987); *Holloway v. Lockhart,* 813 F.2d 874 (8th Cir.1987); *Kegel v. Runnels,* 793 F.2d 924 (8th Cir.1986); *Trnka v. Elanco Products,* 709 F.2d 1223 (8th Cir.1983).

For the purposes of this motion, the sole material fact—and, indeed, the central material fact—is Debtor's intent and state of mind, *vis-a-vis* his creditors and their interests, when he created the joint tenancy in his homestead. While she has brought forward no direct evidence to counter the evidence on which Defendants base their motion, Plaintiff points to enough circumstantial evidence going to the issue of intent to present a genuine issue of material fact. As this Court has noted, factual issues of subjective states of mind usually are not amenable to summary adjudication. *In re Drenckhahn,* 77 B.R. at 712–13, n. 16. Direct evidence of intent is rarely available. *In re Tveten,* 70 B.R. 529, 532 (Bankr.D. Minn.1987); *In re Johnson,* 80 B.R. at 958, n. 7. In the absence of the rare "smoking gun" of an admission as to intent, the fact-finder inevitably is relegated to making inferences on the ultimate issue, from the basis of circumstantial evidence. *Id. See also In re Van Horne,* 823 F.2d 1285, 1287 (8th Cir.1987) (recognizing necessity of same process of proof and inference in dischargeability proceedings under 11 U.S.C. § 523(a)(2)(A)).

Here, though neither side has produced direct evidence of Debtor's intent,[24] both sides adduce competing probative circumstantial evidence going to the issue. On this basis alone, the record presents an obvious issue of fact for trial.

Some aspects of Debtor's professional background could support an inference that he was aware that his homestead would be subject to claims of creditors in probate administration, were it not turned into a "non-probate asset": Debtor is a law school graduate who had received a general legal education; he had passed the Minnesota bar examination, which at the time almost certainly included a component question on wills, estates and probate law; he had practiced law in the private sector for seven years; he had sat as a judge on a state trial court of general jurisdiction; and he had consulted with an attorney whom he knew to be conversant with estate-planning and probate law, apparently going through a standard client interview and "legal diagnosis," with the intent of legally fixing the disposition of his personal wealth were he to die on his protest fast. Too, Debtor had had the recent experience of being a petitioner under Chapter 11, a process which almost certainly involved a general review of creditors' rights with his bankruptcy counsel, and in any event involved an election of exemptions based on advice about the relevant law and procedure.

Other historical factors certainly do not mandate the inference, and may cut against it: Debtor's law practice had been limited to serving as in-house counsel to a major corporation, specializing in transportation law, and a term of service with a local legal aid office doing criminal defense work; ten years elapsed between the time when Debtor graduated from law school and took the bar exam, and the time when he formulated a personal estate plan; and, given the partial specialization in the struc-

ture of the Ramsey County Court system, it is possible that Debtor had not presided over probate matters during his judicial service.

In any event, there is a no conclusive direct evidence as to Debtor's actual knowledge of his and his assets' legal posture at relevant times. The cross-cutting of the basic facts going to this key factual point inescapably leads to conflicting possible inferences.

However, even were the knowledge issue settled at present in Plaintiff's favor, there is still a triable fact issue on the ultimate question of Debtor's intent. In the only admissible direct evidence of record, Debtor equivocated as to whether he intended to prevent his creditors from laying claim to the value of the equity in his homestead, by making it a "non-probate asset." Certain surrounding circumstances would support an inference on the intent element in Plaintiff's favor, were there to be a preliminary credibility determination against Debtor: Debtor's continuing insistence that he was not liable to his former court reporter for the battery claim, which is amply evidenced by his successive appeals from the judgment; the intensely personal and emotional nature of that underlying dispute, and the bitterness and animosity publicly expressed by both participants in it; the great personal and professional pressures brought to bear on Debtor by the pendency of the various court proceedings against him in the spring of 1988; and Debtor's professed willingness to die during the course of his protest fast. Ultimately, however, the nature of Debtor's equivocation itself makes it inadvisable to draw the inference on the ultimate issue. Debtor must be required to fully explain that equivocation.

Defendants essentially argue that the evidence presented on this motion would compel dismissal of Plaintiff's complaint pursuant to FED.R.CIV.P. 41(b) and BANKR.R.

---

**24.** Such evidence ideally would have been in the form of an express statement by Debtor—either that he had specifically intended to see that his homestead would not pass through probate and be subject to claims against his probate estate, or that he overtly denied that such was his intent. When Plaintiff directly and unequivo-cally put the issue to Debtor at his Meeting of Creditors, he evaded answering. Whether he did so upon advice of counsel; from an implicit assertion of attorney-client privilege; out of instinctive, lawyerly equivocation; or out of genuine dissimulation, is not clear from the record.

7041,[25] were this matter to go to trial. This simply is not so. When the central issue in this adversary proceeding was put to him at his Meeting of Creditors, Debtor equivocated. Thus, there is *no* direct evidence as to his intent in the record for this motion. The circumstantial evidence adduced by Defendants is far from overwhelming, and, even standing alone, is not so one-sided that Defendants must prevail as a matter of law.[26] Several of the central factual assertions in the Piepkorn Affidavit are voiced in the passive. This prevents any fact-finding as to precisely *who* intended the creation of the joint tenancy "as an estate-planning technique and for no other purpose," and as to the statements, acts, or other manifestations upon which that person relied in doing so. Too, in drawing, executing, and offering his affidavit, Piepkorn probably was motivated by some amount of self-interest—however understandable under the circumstances. Finally, Debtor—unlike most clients of attorneys—was another person learned in the law, who was familiar from his own legal training and practice with client-interview techniques, and with the ethical obligations of counsel which result from clients' disclosures to them. Thus, the mere fact that Debtor may not have broached the subject of creditors' claims in his consultation with Piepkorn, does not compel an inference that Debtor had not considered creditors' interests, or that he was not harboring an ulterior motive in his "estate planning" notwithstanding the limited scope of his expressed concerns.

As noted earlier, this Court must draw all factual inferences in Plaintiff's favor before determining whether there is a genuine issue of material fact. The drawing of those inferences leads to the conclusion that Plaintiff has brought forward enough evidence upon which the Court might rule in her favor, were appropriate credibility determinations made. Plaintiff has shown that the allegedly undisputed fact of Debt-

or's intent actually presents a triable issue. Only after full evidentiary development can this Court make a competent and defensible finding as to Debtor's intent in creating the joint tenancy, and, in turn, as to Plaintiff's right to avoid the creation of the joint tenancy and to obtain a denial of Debtor's discharge in bankruptcy.

IT IS THEREFORE ORDERED that Defendants' motion for summary judgment is denied.

---

**25.** As a comparison of the standards under the respective rules will show, this is the functional equivalent of a Rule 50(a) directed verdict, for a court trial.

**26.** To use the phraseology of *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 251–52, 106 S.Ct. at 2511–12.