**In re Robert James JOHNSON, Debtor.**

**Harold J. PANUSKA, as Trustee for the Harold J. Panuska Profit Sharing Trust and the Harold J. Panuska Employee Trust Fund, Plaintiff,**

v.

**Robert James JOHNSON, Defendant.**

**Bankruptcy No. 3–86–207.
Adv. No. 3–86–107.**

United States Bankruptcy Court,
D. Minnesota,
Third Division.

March 1, 1991.

Gordon Conn, Faegre & Benson, Minneapolis, Minn., for plaintiff.

Cass S. Weil, O'Connor & Hannan, Minneapolis, Minn., for defendant.

### ORDER FOR JUDGMENT, ON REMAND

GREGORY F. KISHEL, Bankruptcy Judge.

This adversary proceeding is before the Court on remand, on order of the District Court (Rosenbaum, J.) pursuant to the mandate of the United States Court of Appeals for the Eighth Circuit. *See In re Johnson,* 880 F.2d 78 (8th Cir.1989).[1]

---

**1.** This Court's original decision was published as *In re Johnson,* 80 Bankr. 953, 18 C.B.C.2d 51, 16 B.C.D. 1069 (Bankr.D.Minn.1987).

The issue remanded is limited, both factually and legally: Did Debtor act with an "intent to hinder, delay, and defraud creditors," within the meaning of 11 U.S.C. § 727(a)(2)(A),[2] when he liquidated various non-exempt business investments and used a portion of the proceeds to purchase a "whole life" insurance policy which he claimed as exempt[3] in his ensuing bankruptcy case; and when he traded various non-exempt personalty for a harpsichord and a baby grand piano, which he also claimed as exempt[4]? In its mandate, the Eighth Circuit directed this court to apply the principles announced in its opinion, in the earlier related opinion of *Norwest Bank Nebraska, N.A. v. Tveten*, 848 F.2d 871 (8th Cir.1988), and in *Tveten* companion opinion of *Hanson v. First Nat'l Bank in Brookings*, 848 F.2d 866 (8th Cir.1988). Given the adequate development of the record at the 1987 trial and the nature of the issue on remand, the taking of further evidence is not necessary.

As the *Johnson* court acknowledged, in its two 1988 opinions the Eighth Circuit had neither defined the "fraudulent intent" which is proscribed by 11 U.S.C. § 727(a)(2), nor specified the "extrinsic evidence [which] might prove the existence of fraudulent intent"; rather, it had only cited certain examples of "intent" which other courts had found to meet § 727(a)(2)(A) or not. 880 F.2d at 81. The *Johnson* opinion does not frame the abstract rule of law which it applies, as clearly as might be desired; its central and more prominent holding[5] is driven by principles of state law, and the discussion supporting that holding does not completely remedy the deficiency in the *Tveten* opinion which the *Johnson* court pointed out.

However, a closer reading of both *Johnson* and *Tveten* reveals a broader standard for judgment on the issue presented on this remand. This standard is delineated by a series of propositions which are noted in the discussion of both opinions, some of them voiced directly and some indirectly:

1. A debtor's pre-petition conversion of property from a non-exempt form to an exempt form is not fraudulent as to creditors *per se; standing alone*, it does not merit either denial of discharge or disallowance of a claim of exemption. *Johnson*, 880 F.2d at 81–2; *Tveten*, 848 F.2d at 874; *Hanson*, 848 F.2d at 868.

---

**2.** In pertinent part, this statute provides:
The court shall grant the debtor a discharge, unless—

   .    .    .    .    .

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under [Title 11], has transferred, ... or has permitted to be transferred ...—
(A) property of the debtor, within one year before the date of the filing of the [debtor's bankruptcy] petition ...

**3.** Pursuant to 11 U.S.C. § 522(b)(2), Debtor claimed the exemptions available to him under Minnesota state law. For the life insurance policy, he invoked MINN.STAT. § 550.37, subd. 1 and 23:
Subdivision 1. The property mentioned in this section is not liable to attachment, garnishment, or sale on any final process, issued from any court.

   .    .    .    .    .

Subd. 23. The debtor's aggregate interest not to exceed in value $4,000 in any accrued dividend or interest under or loan value of any unmatured life insurance contract owned by the debtor under which the insured is the debtor or an individual of whom the debtor is a dependent.

**4.** For the two keyboard instruments, Debtor invoked MINN.STAT. § 550.37, subd. 1, *supra* n. 3, and subd. 2:
Subd. 2. The family Bible, library, and musical instruments.
After the commencement of Debtor's bankruptcy case, this statute was ruled unconstitutional, as in violation of MINN. CONST. art. 1, § 12. *See In re Hilary*, 76 B.R. 683 (Bankr.D.Minn. 1987).

**5.** The central holding is that, absent a contemporaneous actual misrepresentation or other direct evidence of malign or "fraudulent intent," a debtor in Minnesota may enhance the value of his interest in an exempt homestead by converting virtually any amount of nonexempt assets to homestead equity, without jeopardizing his right to a discharge in bankruptcy. 880 F.2d at 82–4. *Cf. McCormick v. Security State Bank*, 822 F.2d 806 (8th Cir.1987) (discharge properly denied when debtor lied to creditor about current finances and activities, while he was converting non-exempt assets into exempt homestead equity).

2. However, to the contrary of this Court's original ruling, a debtor's intent in making such a transfer is not irrelevant, and in fact controls the outcome of a discharge objection which has the debtor's "bankruptcy estate planning"[6] as its factual basis. *Johnson*, 880 F.2d at 84.

3. Denial of discharge pursuant to § 727(a)(2)(A) is merited if such a transfer is accompanied by "extrinsic evidence of the debtor's intent to defraud creditors." *Tveten*, 848 F.2d at 874; *Johnson*, 880 F.2d at 81–82.

4. Examples of such extrinsic evidence include:

a. the close temporal proximity of the transfer to the entry of judgment against the debtor in favor of an unsecured creditor, or, presumably, to any other exercise of collection remedies against the debtor, *Tveten*, 848 F.2d at 875 (citing *Ford v. Poston*, 773 F.2d 52, 55 (4th Cir.1985));

b. the making of the transfer after the debtor obtained a temporary respite from the collection pressure of creditors, *id.* (citing *In re Reed*, 700 F.2d 986, 991 (5th Cir.1983));

c. "conduct intentionally designed to materially mislead or deceive creditors about the debtor's position," *Johnson*, 880 F.2d at 82; *also, McCormick*, 822 F.2d at 808;

d. a conveyance of non-exempt assets for less than fair value, *Johnson*, 880 F.2d at 82; and

e. the debtor's continued retention, benefit, or use of non-exempt property after a purported conveyance, coupled with inadequate consideration for the conveyance, *Johnson*, 880 F.2d at 82;

*also, Hanson*, 848 F.2d at 869 (citing *In re Cadarette*, 601 F.2d 648 (2d Cir. 1979)).

5. Where a debtor elects state law as the governance for his claim of exemptions, the court may consider the amount of property converted, and the value, amount, and nature of the exempt form retained by the debtor into the bankruptcy case, as evidence going to the debtor's intent. *Tveten*, 848 F.2d at 875–76; *Johnson*, 880 F.2d at 82 and 84.

6. If the state law upon which the debtor relies for a particular claim of non-homestead exemption does not contain limitations as to the value or amount of property which may be protected under it, the court must examine the amount of property converted and the form taken as exempt, and must determine whether these facts are circumstantial evidence of "fraudulent intent." *Johnson*, 880 F.2d at 82 and 84.

7. In all cases, the court must consider the importance of the subject property, as used by the debtor, in furthering the specific objectives of the state exemption law, and in furthering the federal bankruptcy policy of affording a "fresh start" to the debtor in bankruptcy. *Tveten*, 848 F.2d at 875–76; *Johnson*, 880 F.2d at 82 and 84.

With these considerations in mind, the following facts and circumstances, all of record,[7] are relevant to the present inquiry:

*A. Claim of Exemption in Cash Value of Life Insurance.*

1. In December, 1985, and January 1986, within several weeks of his

---

**6.** In this Court's prior definition, the term "bankruptcy estate planning" denotes the process at issue here:

... the conscious, directed effort on the part of a financially-besieged debtor to liquidate personal assets which are not exempt from claims of general creditors under state debtor-creditor law, and to use the proceeds of that liquidation to purchase, or to pay down existing encumbrances on, assets which are exempt under state law, as a preliminary to the debtor's claim of exemptions in those assets in the subsequent bankruptcy case.

80 B.R. at 957. In retrospect, the definition seems prolix—though, judging by the number of times it has been quoted in cases and commentary, it has been attractive to some.

**7.** Those of the following entries which this Court found as fact in its original decision will be noted by a reference to that decision; those which were not, but which are supported by evidence adduced at trial, will be noted by references to the transcript for that trial, abbreviated as "Tr. ___," or by references to trial exhibits.

bankruptcy filing, Debtor sold or liquidated his various business investments, and drew out the money in his account under the pension and profit-sharing plans of his employer. With a portion of the proceeds, he purchased a "whole life" insurance policy on his life from National Life of Vermont. 80 B.R. at 955.

2. Debtor had already consulted with several attorneys about his deepening financial distress, and had a specific understanding of Minnesota exemption laws. 80 B.R. at 954–55.

3. Several creditors had taken judgments against Debtor in October and November, 1985, and numerous other lawsuits were pending against him. 80 B.R. at 954.

4. Debtor had been divorced at some point in the preceding several years. In late 1985 and early 1986, he was single. Tr. at 19.

5. As evidenced by his personal income tax returns for tax years 1983–85, Debtor claimed no personal dependents for those years. Defendant's Trial Exhibits 3–5.

6. When he filed for bankruptcy, Debtor owned no "whole" life insurance with a cash surrender value other than the National Life policy; the other life insurance he owned was "term" insurance. Tr. at 30.

7. When he purchased the National Life policy, Debtor instructed his agent to obtain a policy with a cash surrender value in an amount which he knew would not exceed the amount of the Minnesota state exemption for such an asset. Tr. at 30–1.

8. Debtor purchased the National Life policy with the specific intent of giving himself a means to preserve this amount of money through his bankruptcy case, so he would have funds available to meet his personal expenses until he received his first post-petition salary payment. Tr. at 31.

9. Soon after his bankruptcy filing, Debtor surrendered the National Life policy, and spent the cash he received back from the insurer. Tr. at 31.

10. The only possible inference from this sequence of events is that Debtor never had an intent to use the National Life policy to maintain insurance coverage on his life for the indefinite future.

B. *Claim of Exemption in Musical Instruments.*

11. On December 1, 1985, Debtor traded various antiques and other personalty to a business corporation owned by several personal acquaintances of his, for a baby grand piano. 80 B.R. at 956; Tr. at 24–5.

12. On December 18, 1985, Debtor traded his collection of wooden sport and fishing boats to an acquaintance of his, for a harpsichord of European manufacture. 80 B.R. at 956; Tr. at 22–3 and 27–8.

13. In making both of these exchanges, Debtor was aware that the items which he traded were not exempt under Minnesota state law, and that musical instruments fell within the class of property described in MINN.STAT. § 550.37, subd. 2. Tr. at 22–3 and 24.

14. At trial, Debtor stated the fact that "he liked" both keyboard instruments as one of his motivations for making the trades. He did not elaborate beyond this single sentence. Tr. at 23 and 24.

15. However, neither Debtor nor Beth Kessler, his live-in girl friend, play either of the instruments. Tr. at 81 and 82.

16. From the time of his acquisition to the date of trial, the harpsichord remained in the basement of Debtor's house, and the piano remained in storage at a separate site. Tr. at 81.

17. At trial, Kessler was not even aware that the harpsichord had been in Debtor's house. Tr. at 79.

18. Debtor admitted that he had never been down in the basement with Kessler to inspect or use the harpsichord. Tr. at 82.

Under the rule of decision imposed by the Eighth Circuit's remand, these facts and circumstances compel the factual inference that Debtor made the subject transfers with the proscribed intent. Therefore, he must be denied a discharge in bankruptcy.

■ The series of propositions summarized at pp. 292–93 *supra* require the Bankruptcy Court to do two things. The Court must ascertain the debtor's actual intent in invoking state exemption laws, and his intended use, actual or potential, of the assets claimed as exempt. Then, the Court must measure this intent and use against the purposes for which the legislative branch created exemption laws and bankruptcy remedies. The Eighth Circuit has identified the role which exemptions and exemption-derivative remedies play in promoting the post-bankruptcy "fresh start" which Congress contemplated: "... only those personal goods necessary to the debtor's new beginning and of little resale value fit the federal bankruptcy philosophy ..." *In re Thompson*, 750 F.2d 628, 631 (8th Cir.1984) (applying 11 U.S.C. § 522(f)(2)).[8]

■ Thus, *Johnson* does articulate a standard amenable to application to these situations—and, in general, the facts will fall into two different groupings, with opposite outcomes to the discharge objection. The exempt property in question may have a limited and reasonable value; it may be naturally suited for maintaining modest daily needs for shelter and sustenance, or it may enable the debtor to maintain a degree of personal economic security by continuing to carry on a past profession or trade. If the debtor then actually uses such exempt property for these purposes, or reasonably intends to do so in the future, the facts sustain only one inference: the debtor intended only to make use of statutory protections and remedies in the manner intended by the state legislature and Congress. On the other hand, the debtor may convert non-exempt value to an exempt form without intending to give the new asset the reasonable use which follows from its nature, and/or may not utilize the exempt property for personal and family security and sustenance. These basic facts compel the opposite inference: the debtor intended only to temporarily "shelter" the value of the non-exempt asset from the claims of creditors, for later retrieval via sale or liquidation, and subsequent investment, dissipation, or other use. Under the *Tveten/Johnson* rationale, the latter state of mind equates to the "intent to hinder, delay, or defraud creditors" which is subject to the sanction of denial of discharge.[9]

To apply this test to the facts at bar, it is necessary to divine the purpose behind the state exemption laws which Debtor invoked. The Minnesota State Legislature does not formally publish committee reports, floor debates and statements, or other records of pre-enactment procedures; thus, the process of ascertaining legislative

---

8. A later Eighth Circuit opinion makes it clear that the phrase "of little resale value" must be read somewhat loosely, and against the underlying function of the asset claimed as exempt. *See In re LaFond*, 791 F.2d 623 (8th Cir.1986) (allowing lien avoidance to lie as against exempt farm machinery of relatively substantial value, as long as the debtor was engaged in farming and actually made use of the machinery in question).

9. By listing the separate acts of hindrance, delay, or fraud in the disjunctive, the language of the statute seems to contemplate that any of them could support a discharge objection. The Circuit Court opinion in *Johnson* does not distinguish between these acts, lumping their animus together into a catchall category of "fraudulent intent." It is unclear from *Johnson* whether the Eighth Circuit considers the statutory inclusion of three distinct terms to be anything more than semantic. To the extent that the connotative melding is intended to have substantive consequences, this Court respectfully disagrees, and still holds for the proposition that a finding of "fraud" requires evidence of overt misrepresentation or deception. *See* 80 B.R. at 959. However, under the standard requiring a measurement against the legislative purpose of invoked remedies which the Circuit Court has overlaid in *Johnson*, the use of a "bankruptcy shelter" can certainly evidence an intent to "hinder" or to "delay" creditors or a trustee. *Id.*

intent cannot proceed with the same assuredness with which it can when such materials are available. However, the general legislative purpose of exemption laws—to prevent private destitution and hardship, to support and stabilize the home and the family unit, and to prevent impecunious debtors from burdening the public purse by resorting to charity and welfare programs—is well-established in decisions of the Minnesota Supreme Court,[10] so much so that the legislative purpose of particular exemption laws can be safely inferred from the nature of the property which they protect.

In the case of the musical-instruments exemption of MINN.STAT. § 550.37, subd. 2, history and parallel authority under the state homestead exemption illuminate the legislative purpose. The extension of exemption protection to such family possessions and keepsakes as a Bible, the home library, and musical instruments seems to be one of those pieces of nineteenth-century legislation which embodied and honored the pieties of the growing Republic. Such enactments manifested a public policy encouraging stable family life, education, and the refinement of tastes and emotions, through the tempering influence of religious faith and the arts, sciences, and letters. *See, e.g., Ferguson v. Kumler*, 27 Minn. 156, 159, 6 N.W. 618, 619 (1880) (examining policy behind homestead exemption, and noting "the interest of the state, whose welfare and prosperity so largely depend upon the growth and cultivation of feelings among its citizens of personal independence, together with love of country and kindred—sentiments that find their deepest root and best nourishment where the home life is spent and enjoyed ..."); *Poznanovic v. Maki*, 209 Minn. 379, 382, 296 N.W. 415, 417 (1941) (noting the purpose of exemption laws as "allowing [debtors] out of [their property] some reasonable means of support and education and the maintenance of the decencies and proprieties of life ..."). The actual retention use, and maintenance of such items by the

debtor and his family members, however, is essential to the accomplishment of this legislative purpose. *In re Hilary*, 76 B.R. at 685 (to fall under MINN.STAT. § 550.37, subd. 2, musical instruments must be for the personal use of the debtor and members of the debtor's family).

The legislative purpose of the exemption for the current cash value of a life insurance policy in the hands of a living debtor is similarly evidenced by the nature of the subject asset, and through parallel authority. Life insurance, of course, is an investment which is usually intended to be a cushion against the financial hardship which might otherwise befall survivor-beneficiaries of the insured policyholder, upon the death of the policyholder and the beneficiary's loss of his or her financial support. For the great majority of policyholders and their dependents, it ends up functioning as such. Minnesota state law grants an exemption for the proceeds of several forms of insurance coverage, and the right to receive those proceeds, when the proceeds or rights are held by the beneficiaries of the policyholder. In creating these exemptions, the legislature fully contemplated the retention of the value of such insurance policies in that form, for the purpose of maintaining protection against such hardship. *See* MINN.STAT. § 550.37, subd. 10, and *Cook v. Prudential Ins. Co. of America*, 182 Minn. 496, 600, 235 N.W. 9 (1931) (statutory protection for life insurance proceeds operates to protect the surviving spouse and child of a deceased policyholder); as well as MINN.STAT. § 550.39, and Note, *Minnesota Legislation of 1936 and 1937*, 22 MINN.L.REV. 219, 237 n. 44 (1938) ("The purpose of this statute [protecting benefits and rights to benefits under accident and disability insurance policies] is to relieve the insured and dependent, whose chief source of income is cut off by accident to or by disability of the insured from being rendered destitute."). While there is no comparable illustrative authority for MINN.STAT. § 550.37, subd.

---

**10.** *See, e.g.,* Minnesota cases cited in *In re Johnson*, 80 B.R. at 962–63; *Ryan v. Colburn*, 185

Minn. 347, 350, 241 N.W. 388, 389 (1932).

23, it clearly serves the same goal, as applied to property rights under a contract of insurance when that contract is at a different stage in its maturation.

As noted, there is enough circumstantial evidence going to Debtor's intent in investing non-exempt value in the exempt assets in question to support findings on the ultimate fact issue which the Eighth Circuit has remanded. That evidence clearly establishes that Debtor did not mean to acquire any of these assets for the purposes which the legislature sought to advance in bringing them under statutory protection. He has never used either keyboard instrument, whether for his own enjoyment or edification, or for that of others; in fact, he apparently does not know how to play them, and no one has used them since he acquired them. He did not intend to maintain the National Life policy to protect family members or other legal dependents from the loss of support in the event of his death; he had no immediate family members to protect, and he candidly admitted that, in purchasing the policy, he did not intend to protect anyone from this risk. In any event, he already had life insurance coverage under a "term" policy, presumably in amounts he had previously deemed appropriate, and there is no evidence of record that he or his intended beneficiaries needed any additional protection.

■ The evidence is clear, unequivocal, and conclusive: Debtor intended to use his claims of exemption in the keyboard instruments and the National Life policy as a temporary "shelter" for the several thousands of dollars' worth of value involved. The corollary finding—that he fully intended to recoup that value by liquidating the exempt forms after financial pressures abated—is established as accomplished fact in the case of the National Life policy, and as the only reasonable inference in the case of the keyboard instruments. The clear dictate of *Tveten* and *Johnson* is that intent of this sort equates to the intent which merits denial of discharge under 11 U.S.C. § 727(a)(2)(A). Thus, while the present result is entirely to the contrary of that reached under this Court's earlier decision, that result is unavoidable.

■ This conclusion is fraught with a terrible irony. In its holding, the Eighth Circuit barred the great majority of Debtor's transfers of value from consideration for the sanction of denial of discharge; this left only three transfers for this Court's scrutiny on remand, all of which seem modest by comparison.[11] Thus, it may seem that the kingdom was lost for a farthing in this case. However, the Eighth Circuit would not have remanded this matter, had it not contemplated the remaining transactions as constituting just the "exceptional case" which it noted in its discussion.[12] In the last analysis, the size of the subject transfer does not bear on the merits of an objection to discharge under § 727(a)(2); a small transfer is subject to sanction as a large one, if the complaining creditor proves all of the elements under the stat-

11. As discussed earlier at n. 5, the Eighth Circuit ruled that Debtor's enhancement of his homestead equity was not a ground for denial of discharge. It seems to have assumed, without discussion, that the failure of Debtor's attempt to fund a large, exempt personal annuity policy makes his act of converting non-exempt value into that form irrelevant to Plaintiff's discharge objection. 880 F.2d at 84 (noting that "[a]t this stage [Debtor] has been reduced to claiming only the homestead exemption, musical instruments objection and life insurance objection.... The bankruptcy court must decide with respect to the remaining exemptions if the facts, including the amounts involved, show fraud.") Other courts might disagree with the Eighth Circuit's conclusion as to the irrelevance of Debtor's annuity purchases. *See, e.g., In re Adeeb*, 787 F.2d 1339, 1343 (9th Cir.1986), and cases cited therein. Regardless, this Court has addressed only those issues specifically remanded to it.

12. The *Johnson* court noted in passing that "*Tveten* and *Hanson* sanction an exceptional use of judicial discretion," 880 F.2d at 83, one which "should be reserved for exceptional cases...," 880 F.2d at 84. This remark is really only an observation, without substantive import, and seems to be a counterpoint to the substantive conclusion which immediately follows it: the "power sanctioned in *Tveten* ... has no application to homestead exemptions." 880 F.2d at 84. The "exceptional circumstances," however, are those delimited by the remainder of the *Johnson* analysis; to conclude otherwise would render the rest of the opinion nugatory.

ute. *In re Elholm*, 80 B.R. 964, 971 n. 4 (Bankr.D.Minn.1987).

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED that, pursuant to 11 U.S.C. § 727(a)(2)(A), Debtor is denied a discharge in bankruptcy.

LET JUDGMENT BE ENTERED ACCORDINGLY.