**In re Arthur SHOLDAN, Debtor.**

**Bankruptcy No. 94–35523.**

United States Bankruptcy Court,
D. Minnesota,
Third Division.

March 31, 1998.

Clark T. Whitmore, Maslon, Edelman, Borman & Brand, L.L.P., Minneapolis, MN, for Debtor.

Michael S. Dietz, Rochester, MN, trustee.

## ORDER ON REMAND

GREGORY F. KISHEL, Bankruptcy Judge.

This Chapter 7 case is before the Court on remand from the United States District Court for this District (Tunheim, J.) and pursuant to the mandate of the United States Court of Appeals for the Eighth Circuit. *In re Sholdan v. Dietz,* 108 F.3d 886 (8th Cir. 1997).

### THE CASE, IN BRIEF

Judge Tunheim summarized the salient aspects of this dispute in his decision:

> Arthur Sholdan ... was a 90–year–old retired farmer who bought a new three-bedroom house to shield his assets from a tort creditor, moved in, filed for bankruptcy, and died. The trustee of his bankruptcy estate ... objected to his claim of exemption for his homestead.

*In re Sholdan,* CIV 4–95–846, Memorandum Opinion at 1 (D.Minn. February 20, 1996).

### THE ISSUE, IN BRIEF

After receiving evidence on the Trustee's objection, this Court found that the Debtor had transferred substantial value from a non-exempt, liquid form into the homestead with an intent to hinder or delay his creditors, and ruled that Minnesota law rendered his claim of exemption unenforceable against the bankruptcy estate. The personal representative of the Debtor's probate estate appealed. Judge Tunheim affirmed. On further appeal by the personal representative, the Eighth Circuit noted:

Here the bankruptcy court made no finding as to whether [the Debtor] claimed his homestead exemption with the "intent to defraud." While the facts of this case might well support a finding of "intent to defraud," we cannot make such a finding. [Citation omitted.]

... [W]e do not mean to say that the test of "hinder or delay" might not prevail under another set of facts. In this case, however, the facts do not support such a finding.

108 F.3d at 888. As a result, the Eighth Circuit remanded "for a factual finding on the issue of [the Debtor's] 'intent to defraud.' " *Id.*

### THE FACTS, AT LENGTH

As is almost always the case, there is no direct evidence going to the central fact issue: the state of mind that accompanied the Debtor's act of transfer. However, numerous facts and circumstances surrounding the transfer support an inference on the ultimate issue.

1. The Debtor was a Steele County, Minnesota, resident. He farmed livestock and crops near the town of Geneva over a long career.

2. In 1980, the Debtor retired from active farming, and sold his land and operation. He retained a mortgage against the real estate to secure all or part of the purchase price.

3. The Debtor then moved into the town of Ellendale, Minnesota and took a modest apartment above a meat market in the business district.

4. With several short interruptions, the Debtor resided in that apartment for approximately 13 years.

5. Over that period, the Debtor realized or retained approximately $140,000.00 in value from the sale of his farm, or previously-accrued savings. He kept these funds liquid, in the form of accounts, certificates of deposit, and the purchase-money mortgage against his former farmstead.

6. In 1992, the Debtor was approximately 88 years old. In July of that year he was involved in a head-on accident with Raymond Olson, a motorcyclist. The Debtor had crossed the center line of a two-lane highway and was driving in the wrong lane.

7. Olson suffered very severe and permanent injuries in the accident. In July, 1993, he sued the Debtor in the Minnesota State District Court for Steele County, seeking an award of damages in excess of $50,000.00.

8. It was clear from the nature of the injury and the circumstances of the accident that the Debtor was exposed to personal liability well in excess of the $50,000.00 in coverage he had maintained on his own vehicle.

9. On December 4, 1993, the Debtor took up residence at the Mineral Springs Board and Lodging House, an assisted-care facility for elderly men. The Debtor previously had stayed there on several occasions to recuperate after hospitalizations. He moved into Mineral Springs on a permanent basis because his advanced age prevented him from adequately caring for himself.

10. The Debtor retained the lease on his Ellendale apartment until August, 1994, but never returned to live there. At Mineral Springs, the staff provided him with meals, laundry and housekeeping services, transportation to his medical appointments, and the dispensing of his medications.

11. During this time, the Debtor was afflicted with a number of serious medical conditions. All of them were fully to be expected for a man of his advanced age. They included congestive heart failure; hypertension; arteriovascular disease (hardening of the arteries); chronic constipation and gastritis; and cancer of the prostate in an early stage. He also suffered from a chronic cough, though he tested negative for tuberculosis in early 1994. Over the several preceding years, these conditions had manifested themselves by shortness of breath; physical weakness and fatigue; "moderately significant" pedal edema (swelling of the feet, caused by fluid retention); urinary insufficiency; and digestive and gastrointestinal upset. As of mid–1994, all of them but the prostate cancer were reasonably controlled by medication, but were not subject to cure. The cancer was in the form of a very slow-

growing tumor that did not bode to become seriously symptomatic for up to twenty years. However, in the opinion of the Debtor's own physician, in light of his age and condition "the stage was set" for a "massive incident," probably cardiac in nature, that would terminate his life.

12. As a man approaching the age of 90, who had had a full life, the Debtor could not have reasonably expected to live many more years. There is no evidence that he did not understand the gravity of the ongoing processes of aging that were slowing and impairing his basic bodily functions one by one. After his move into Mineral Springs, he clearly recognized that his condition impaired him. While the Debtor did not anticipate death as imminent in the summer and fall of 1994, he had experienced a number of serious and problematic symptoms in the recent past. Remarks he had made with some frequency over the preceding years established that he was amply realistic about his own mortality, and was aware that he would die sooner rather than later.

13. By all indications, the Debtor was mildly dissatisfied with his accommodations and situation at Mineral Springs. There is no evidence that he considered any alternative living arrangement on his own motion, however.

14. The Debtor had been a life-long bachelor and had no dependents. He had one nephew, Earl Jensen. Earl had a stepbrother, Roger Jensen. In his Last Will and Testament, executed in 1986, the Debtor bequeathed his whole estate to his sister, Earl Jensen's mother. If she predeceased the Debtor, the Jensen stepbrothers' children were his beneficiaries.

15. In the spring of 1994, the Debtor approached the Jensens to discuss his situation in light of Olson's pending lawsuit against him. He asked the Jensens to assist him in dealing with the situation.

16. At this time, the Debtor understood that he could lose his assets if Olson obtained a judgment against him in an amount greater than covered by his liability insurance. The Debtor gave Earl Jensen a power of attorney over his legal affairs.

17. The Jensens were both suburban Twin Cities residents employed by a business in Bloomington. They consulted attorneys for assistance in protecting the Debtor's assets from collection by Olson.

18. At some point in the spring of 1994, the Jensens contacted Bradley V. Larson, an attorney with offices in Monticello, Minnesota,[1] apparently on referral from another attorney in Minneapolis.

19. After they consulted with Larson, the Jensens brought the Debtor back to Larson's office for several appointments in the spring and early summer of 1994.

20. After these appointments, the Jensens contacted Leonard Binstock, a real estate agent in Owatonna, Minnesota, in early August. They retained him to locate a house for the Debtor to purchase.

21. The Jensens specifically instructed Binstock to find a good-quality home, located in or near the countryside, and priced in the range of $130,000.00 to $140,000.00.

22. After the Jensens rejected a group of farm properties Binstock had assembled, they reviewed several in-town dwellings he had located. They and the Debtor soon decided to proceed with the purchase of one at 200 Summer Street in Owatonna.

23. This house was newly-constructed, had never been occupied, and was being offered for sale by the builder. It had three bedrooms and a double-stall attached garage. It was on the market for $122,900.00.

24. The Debtor signed a purchase agreement for this house on September 6, 1994. As part of this agreement, the builder-seller agreed to add a 12-foot by 18-foot deck with railing, roof gutters and downspouting, a full concrete driveway, sod and landscaping, and various other finishes. These additions brought the purchase price up to $134,000.00. The Debtor and the Jensens specifically inquired of the builder as to the amount by

1. Monticello is in Wright County, Minnesota, to the northwest of the Minneapolis–St. Paul metropolitan area. Ellendale is due south of the metro area. Ellendale is about 120 miles from Monticello.

which the purchase price would increase if these features were added.

25. Between August 24 and September 6, 1994, the Debtor liquidated $116,510.72 in bank accounts and certificates of deposit, and sold his mortgagee's rights against his former farmstead to Roger Jensen and his wife, for the face value of the outstanding principal balance. The proceeds cumulated to $162,769.22.

26. The Debtor used these proceeds to pay the full purchase price of 200 Summer Avenue in cash. He never considered financing the purchase through a mortgage.

27. The Debtor did not originate the idea of purchasing a house for himself.

28. Before the Debtor closed on the purchase, the Jensens placed an ad in the Owatonna *People's Press,* seeking an in-home caregiver for him. Ultimately, Earl and Roger Jensen and their spouses, and Earl's mother, interviewed a licensed practical nurse named Mary Hippen for the position. Hippen had geriatric care experience. After the Jensens hired her, Hippen moved into 200 Summer Avenue on October 15, 1994.

29. The Debtor left Mineral Springs on October 16, 1994, and moved into the house.

30. Neither the Debtor nor the Jensens informed the Debtor's physician or the proprietor of Mineral Springs about their plans until after the closing on the purchase.

31. For approximately four months, Hippen resided at 200 Summer Avenue as a caregiver to the Debtor. She prepared meals, did housekeeping and laundry, administered his medications, and assisted him in his day-to-day financial affairs. The Debtor was able to meet his own personal hygiene needs, but he could not do these other things on his own. Hippen had other jobs during the day, for which she left the house; however, she generally returned at lunch time to make sure that the Debtor ate. Hippen or the Debtor's friends transported the Debtor to and from his medical appointments and other out-of-home destinations, as he did not drive.[2] When Hippen was given weekend

time off or otherwise had to leave for an extended period spanning a night, she dropped the Debtor off at Mineral Springs. The Debtor stayed there until Hippen returned to the house.

32. Over this period, the Debtor occasionally remarked to Hippen that he "had never had his own house, that nice of a house." To other acquaintances, he appeared "thrilled" at the prospect of living in the house. This contrasted with his subdued demeanor while he was living in his apartment or at Mineral Springs.

33. Before the Debtor liquidated his bank deposits, he used the interest earnings on them to help meet his rent and living expenses. After he purchased 200 Summer Avenue, his sole source of income was Social Security retirement benefits, in the amount of $486.00 per month.

34. During the Debtor's residence at 300 Summer Avenue in the fall of 1994, his basic monthly living expenses included the following, but were not limited to them:

| | |
|---|---|
| Groceries | 175.00 |
| Utilities (gas and electric) | 120.00 |
| Telephone | 25.00 |
| Clothing | 20.00 |
| Cable television | 30.00 |
| Garbage removal | 15.00 |
| Medications | 50.00 |
| | $435.00 |

This list, to which Hippen attested, does not include anything for transportation, home repair and maintenance, or real estate taxes and assessments. Nor does it include any payment of wages to Hippen. Apparently, she was compensated solely by the furnishing of room and board to her.

35. After payment of these minimal expenses, the Debtor had a monthly income surplus of approximately $50.00, or $600.00 on an annual basis.

36. The real estate taxes for 200 Summer Avenue that were payable in 1995 totalled $52.00, due on May 15, 1995. After the construction of the house in 1994–1995, the taxes payable in 1996 increased to approxi-

**2.** The 1988 Cadillac with 110,000 miles that the Debtor scheduled for this case apparently remained parked in the attached garage.

mately $2,000.00, due in two equal installments on May 15 and October 15. The latter amount was far more than the Debtor's anticipated cumulative annual income surplus.

37. There is no evidence of record as to whether the Debtor was even aware of this, let alone as to the plans he had to meet the tax obligation over the longer term.

38. For the duration of the Debtor's ownership of 200 Summer Avenue, he and Hippen were the sole occupants. He talked occasionally about the possibility of remodeling the basement for use as a rental unit, but did not do anything about it. There is no evidence that he ever invited relatives or friends to visit or stay with him.[3]

39. On December 7, 1994, the Debtor filed the voluntary petition under Chapter 7 that commenced this case.

40. On his Schedule C, the Debtor claimed an exemption in the house at 200 Summer Avenue to the full extent of its stated market value of $135,000.00, citing MINN.STAT. §§ 510.01–510.02 as the statutory basis of the claim.

41. The only debts scheduled for the Debtor's bankruptcy filing were Olson's claim, and the crossclaim and subrogation claim surrounding it. The Debtor scheduled the value of Olson's claim as "Unknown, but may be greater than $500,000." He did not characterize it as unliquidated or disputed in the blank left for that purpose. Olson has filed a proof of claim, asserting that the Debtor is liable to him in the sum of $1,000,-000.00. No one has objected to this claim.

42. On February 1, 1995, the Debtor attended the meeting of creditors in this case.

43. Four days later, on February 5, 1995, the Debtor suffered a myocardial infarction (heart attack), and died.

## DISCUSSION, AT LENGTH: THE LAW AND THE INFERENCE

As the Eighth Circuit noted in its decision, the Debtor's claim of homestead exemption is governed by state law. 108 F.3d at 888. As elected by the Debtor, that law is MINN.STAT. §§ 510.01–510.02,[4] as construed by the Minnesota state appellate courts.

■ The Minnesota Supreme Court has addressed the question at bar in a number of decisions, refining its analysis each time. The most recent pronouncement comes from *In re Tveten*, 402 N.W.2d 551, 555 (Minn. 1987):

In the past, in holding that an insolvent debtor may convert nonexempt property into exempt homestead property, we have noted that the debtor's actions in so doing did not in and of themselves constitute a fraud on creditors ... [Quotation and citation omitted.]

. . .

Although the law allows a debtor to convert nonexempt property into exempt property, it does not allow a debtor to perpetrate a fraud on creditors.... [T]o establish fraud, evidence must be produced in addition to the mere conversion of nonexempt property to exempt property.... Under Minnesota law, if conversion of nonexempt property to exempt property does not, of itself, constitute a fraud on creditors, what does? The answer lies in the Uniform Fraudulent Conveyance Act (UFCA), ... now codified as Minn.Stat.

---

3. To the contrary, Earl Jensen testified that the Debtor spent the Thanksgiving and Christmas holidays of 1994 at Mineral Springs, while Hippen was off duty to be with her family. The Jensens, apparently, had other commitments.

4. MINN.STAT. § 510.01 provides, in pertinent part:

The house owned and occupied by a debtor as the debtor's dwelling place, together with the land upon which it is situated to the amount of area and value hereinafter limited and defined, shall constitute the homestead of such debtor and the debtor's family, and be exempt from seizure or sale under legal process on account

of any debt not lawfully charged thereon in writing ...

In turn, MINN.STAT. § 510.02 provides, in pertinent part:

The homestead may include any quantity of land not exceeding 160 acres, and not included in the laid out or platted portion of any city. If the homestead is within the laid out or platted portion of a city, its area must not exceed one-half of an acre. The value of the homestead exemption, whether the exemption is. claimed jointly or individually, may not exceed $200,-000 or, if the homestead is used primarily for agricultural purposes, $500,000 ...

§§ 513.20–513.32 (1986). The UFCA delineates two types of fraud—fraud implied by law and fraud as a matter of fact. The *Tveten* court, then, recognized that the use of a fraudulent transfer to acquire a nominally-exempt asset can vitiate that legal status, and make the asset subject to the claims of creditors. It noted that the UFCA defined fraud in pertinent part, as

> [e]very conveyance made ... with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors ...

402 N.W.2d at 556 (citing former MINN.STAT. § 513.26). It then reiterated

> the proposition that before actual fraudulent intent can be found, "there must appear in evidence some facts or circumstances which are intrinsic to the mere facts of conversion of nonexempt assets into exempt and which are indicative of such fraudulent purpose."

*Id.* (quoting *Forsberg v. Security State Bank,* 15 F.2d 499, 502 (8th Cir.1926)). Finally, it observed that the existence of "actual intent ... to hinder, delay, or defraud" creditors was a question of fact for the trial court. *Id.*

Shortly after *Tveten* was issued, the Minnesota Legislature repealed the UFCA and enacted the Uniform Fraudulent Transfer Act (UFTA), current MINN.STAT. §§ 513.41–513.51. That statute contains a near-exact analog to the provision that the *Tveten* court relied on:

> A transfer made ... by a debtor is fraudulent as to a creditors, ... if the debtor made the transfer or incurred the obligation:
>
> (1) with actual intent to hinder, delay, or defraud any creditor of the debtor ...

MINN.STAT. § 513.44(a)(1).

The courts have observed that direct evidence of fraudulent intent is rarely forthcoming. *E.g., In re Van Horne,* 823 F.2d 1285, 1287 (8th Cir.1987) (applying 11 U.S.C. § 523(a)(2)(A)). Picking up on this commonplace of real life, the UFTA allows the trial court to make an inference on the ultimate fact from the presence of various basic facts:

> (b) In determining actual intent under [Minn.Stat. § 513.44](a)(1), consideration may be given, among other factors, to whether:
>
> (1) the transfer or obligation was to an insider;
>
> (2) the debtor retained possession or control of the property transferred after the transfer;
>
> (3) the transfer or obligation was disclosed or concealed;
>
> (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
>
> (5) the transfer was of substantially all the debtor's assets;
>
> (6) the debtor absconded;
>
> (7) the debtor removed or concealed assets;
>
> (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
>
> (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
>
> (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and
>
> (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

MINN.STAT. § 513.44(b). *See also Citizens State Bank of Hayfield v. Leth,* 450 N.W.2d 923, 927 (Minn.App.1990); *In re Mathews,* 207 B.R. 631, 646–649 (Bankr.D.Minn.1997) (both applying analysis from statute.)

The Eighth Circuit has approved the use of the same inferential process in applying the statutory language "with intent to hinder, delay or defraud creditors," wherever that language is found—in state fraudulent-transfer statutes, 11 U.S.C. § 548(a), or 11 U.S.C. § 727(a)(2). *In re Graven,* 936 F.2d 378, 383 (8th Cir.1991) (applying both Missouri enactment of UFCA and 11 U.S.C. § 548(a)(1), and noting that they use "the same standard"); *In re Graven,* 64 F.3d 453, 456 (8th Cir.1995) (ditto); *In re Sherman,* 67 F.3d 1348, 1353 (8th Cir.1995) (noting "it was ap-

propriate for the bankruptcy court to utilize Missouri's codification of the common law badges of fraud in its analysis" under 11 U.S.C. § 548(a)(1)). *See also Norwest Bank Nebraska, N.A. v. Tveten*, 848 F.2d 871, 874 (8th Cir.1988) (standard in challenge to discharge under 11 U.S.C. § 727(a)(2)(A), where facts involved transfer of asset value from non-exempt to exempt form, is the same as that governing underlying claim of exemption under state law).

In 1988–89, the Eighth Circuit made three major pronouncements on the meaning of "intent to hinder, delay, or defraud a creditor," as applied to the fact situation at bar—a debtor's pre-bankruptcy transfer of asset value into exempt form. *Hanson v. First Nat'l Bank in Brookings*, 848 F.2d 866 (8th Cir. 1988); *Norwest Bank Nebraska, N.A. v. Tveten*, 848 F.2d 871 (8th Cir.1988); *In re Johnson*, 880 F.2d 78 (8th Cir.1989). An attempt to harmonize the rationales of the three decisions is set forth on remand from one of them, in *In re Johnson*, 124 B.R. 290 (Bankr.D.Minn.1991), particularly at pp. 292–293 and 295–297. Under that synthesis, a creditor or trustee challenging the transfer of value into real estate subject to a claim of homestead exemption must produce extrinsic evidence of misrepresentation, or a malign or fraudulent intent on the part of the debtor. 124 B.R. at 292 n. 5 (citing *In re Johnson*, 880 F.2d at 82–84). Certain "badges" will support an inference of that intent. They include

> ... the close temporal proximity of the transfer to the entry of judgment against the debtor in favor of an unsecured creditor, or ... to any other exercise of collection remedies against the debtor ... [and]
>
> ...
>
> the debtor's continued retention, benefit, or use of nonexempt property after a purported conveyance, coupled with inadequate consideration for the conveyance ...

124 B.R. at 293 (citations to *Tveten* and *Johnson* omitted).

This all makes a seamless web for the issue at bar, woven among many sources of legal authority. The Minnesota Supreme Court and the Eighth Circuit clearly favor a process of fact-finding and ruling derived from the one adopted in all of the cited cases, uniform in scope and standard.

In this process, greater deference is to be given to debtors on the intent issue, where the asset to which value is transferred is subject to a claim of homestead exemption. *Johnson*, 880 F.2d at 83. Even there, however, a finding of fraudulent intent may be made on appropriate evidence. *Id.; Kangas v. Robie*, 264 F. 92, 94 (8th Cir.1920); *Nash v. Bengtson*, 179 Minn. 7, 228 N.W. 177, 179 (1929); *Small v. Anderson*, 139 Minn. 292, 166 N.W. 340, 342 (1918); *In re Curry*, 160 B.R. 813, 817–819 (Bankr.D.Minn.1993); *In re Whitney*, 107 B.R. 645, 650 (Bankr. D.Minn.1989). Such evidence can include the purchase of a homestead with revenue or assets in a significant departure from past uses of them, contrary to creditors' established expectations, *Kangas v. Robie;* the use of unsecured credit, or the proceeds of previously-pledged assets, to buy the exempt property, *Hanson*, 848 F.2d at 869; the use of an artificially-complicated series of transfers to take property value from a nonexempt form into a homestead, *Nash v. Bengtson;* and concealment of the act of transfer from pressing creditors, or some other inequitable subterfuge, *McCormick v. Security State Bank*, 822 F.2d 806 (8th Cir.1987), and *In re Curry*. In the face of an objection, the proponent of the exemption must produce evidence to compel a finding that the exchange of assets "was with a view on the part of [the debtor] of acquiring a homestead for himself and his family." *Small v. Anderson*, 166 N.W. at 341.

Thus, there is firm guidance for the process of inference here. The basic facts are virtually uncontested, and can be readily arrayed against the conceptual framework of the recognized badges of fraud.

In the summer of 1994, the Debtor was a named defendant in personal injury litigation that was likely to result in a very large judgment against him, far in excess of his liability insurance coverage. He held a respectable amount of personal wealth, in forms that were not protected from claims of

creditors under Minnesota state law.[5] The size of the potential excess recovery against him made him insolvent. The entry of judgment in Olson's lawsuit promised to strip him of every last liquid cent, via levy of execution.

Knowing that, and upon advice that he could attempt to forestall it, the Debtor took the great majority of property he had in nonexempt forms, and transferred it into another form—one he still held in fee title, but one nominally exempt from claims of creditors. He did so at the instigation of the Jensens. The Jensens' close blood relatives stood to gain fully by the strategy that Larson conceived as counsel. The Jensens then consummated the strategy under Larson's advice.[6] The transfer of value was planned, and was to be followed in close succession by the Debtor's bankruptcy filing and discharge.

Significantly, Larson's office was far from the Debtor's home ground. That isolation enabled him and the Jensens to structure the transfers and make the bankruptcy filing with virtually no chance of discovery by Olson before the Debtor was under the protection of this Court. The Debtor and the Jensens left his doctor and the Mineral Springs staff unadvised about the move until the time of its consummation.

In the short run, the Debtor retained the full benefit of the value transferred. He also intended to retain full control over its postmortem disposition through his probate estate, by boxing Olson's claim within the bankruptcy process and then extinguishing it through discharge. The discharge would ensure that the claim would not survive to be allowed against the Debtor's probate estate. Given the Debtor's age and health, his death was an eventuality—and sooner rather than later, in a normal frame of reference. The transferred value would be administered by the Debtor's personal representative, free of Olson's claims. Given the desirable characteristics of the hand-picked form, the ultimate passage of the value to the Jensens' blood relatives promised to be quick and easy.

The most striking thing about all of this, the form and results of the transfer as well as the level of deliberation, was its utter lack of precedent in the Debtor's own experience. All of the evidence on the Debtor's prior mindset and actions creates a rather clear picture, and one that does not require much of an inferential jump from the basic evidence.[7] The Debtor seems to have been a humble and rather frugal man, of limited education[8] and devoted to his farming. His remarks about 200 Summer Avenue strongly suggest that the home on his farmstead was smaller, older, and plainer, by contrast. His life accumulation of wealth was respectable for one in his trade and circumstances, but certainly not huge. He kept it invested in the safest and most conservative and liquid financial products one can find in a small-town market. For 14 years he preserved the principal and lived on its modest earnings, in very humble surroundings—a burden on neither family nor society.

Clearly, the Debtor had lived and was living his life within very fixed, self-set limits,

---

5. MINN.STAT. § 550.37 is the main statute granting exemptions for personal property in Minnesota. Neither it nor any of the other isolated exemptions scattered over other chapters create an unqualified exemption for funds on deposit at financial institutions. The only exception is very limited and evanescent: MINN.STAT. § 550.37 subd. 13 further protects earnings that are exempted from wage garnishment under MINN.STAT. § 571.922, by making them exempt after they are deposited with a financial institution. This protection, however, lasts only for 20 days after deposit.

6. There is no direct evidence of record as to the content of Larson's advice or the colloquy that took place during his consultations with his clients. The personal representative invoked the attorney-client privilege when the Trustee tried to elicit Earl Jensen's testimony on these points; the objection had to be sustained. Given all of the surrounding circumstances, however, there is no other inference to be drawn.

7. On his appeal to the District Court, the personal representative of the Debtor's probate estate objected to the following observations, apparently on the ground that the record lacked evidence to support them. Judge Tunheim dismissed this as so much cavail; he opined that the remarks about the Debtor's character were nothing more than "observations about the human interest aspects of this dispute," without legal significance in themselves.

8. His death certificate states that he had completed the eighth grade.

motivated by a traditional Midwestern ethic of not imposing himself on others, and of not being demanding. The use of his life savings to indulge himself was probably an alien concept.[9] On the other hand, a motivation to preserve those savings for the benefit of blood kin, at all costs, would not have been; and clearly, with some prompting, it was not.

Very recently, the Eighth Circuit used the "badges of fraud" approach when it applied the phrase "with the intent to hinder, delay, or defraud" in the fraudulent-transfer remedy provision of the Federal Credit Union Act. *National Credit Union Admin. Board v. Johnson,* 133 F.3d 1097, 1102 (8th Cir.1998). The court observed:

> Among the more common badges of fraudulent intent at the time of a transfer are:
> (1) actual or threatened litigation against the debtor; (2) purported transfer of all or substantially all of the debtor's property; (3) insolvency or other unmanageable indebtedness on the part of the debtor; (4) a special relationship between the debtor and the transferee; and (5) retention by the debtor of the property involved in the putative transfer.
>
> . . .
>
> "the confluence of several [badges of fraud] can constitute conclusive evidence of an actual intent to defraud."

*Id. citing and quoting F.D.I.C. v. Anchor Properties,* 13 F.3d 27, 32 (1st Cir.1994) which in turn quoted *Max Sugarman Funeral Home, Inc. v. A.D.B. Investors,* 926 F.2d 1248, 1254–1255 (1st Cir.1991).

Arrayed in the fashion just presented, this case has the conclusive evidence envisioned by *NCUAB v. Johnson.* Every one of the badges recognized in that decision is here. After causing very substantial injury to another person, and envisioning a result in which his accident victim would be deprived of the recovery that he could have had before, the Debtor transferred substantial value into the house at 200 Summer Avenue. The amount transferred was at least 83 percent of his liquid net worth. The Debtor intended that the ultimate transferee of this value would be relatives of his, or their relatives—persons in a "special relationship" with him. He retained the benefit of the value in the meantime, in a form quite out of proportion to his past expectations or current needs. He effected the transfer in a clandestine manner. The transfer was coupled with the manipulation of discharge in bankruptcy, to specifically defeat the rights of one creditor who never bargained for that status. The combination was designed to give the Debtor far more control over his property rights than he needed for his personal support for the remainder of his life.[10]

*NCUAB v. Johnson* explicitly envisions that an inference of "fraudulent intent" can be made on the circumstances of this transfer alone. To the extent that *In re Johnson* blunts that conclusion, the inference is made nearly irresistible by the addition of the bankruptcy filing and the inevitability of the Debtor's early demise. Though by its nature death is not often invoked as an ally against creditors, the alignment may not be exploited in bankruptcy. *In re Miera,* 104 B.R. 989 (Bankr.D.Minn.1989) (debtor's pre-bankruptcy transfer of exempt homestead into joint tenancy with sister, coupled with anticipation of death, may be subject to avoidance as fraudulent transfer if made with actual intent to hinder, delay, or defraud judgment creditor that otherwise would have received distribution from probate estate).

---

9. In some respects, the latter-day Minnesota archetype of the Norwegian Bachelor Farmer comes to mind. G. KEILLOR, LAKE WOBEGON DAYS at 150–152 (1985). The match, however, is not complete. The self-effacement, parsimony, and relentless avoidance of ostentation definitely ring true. On the other hand, the Debtor seems to have been a well-mannered, cheerful and openly gentle person in his time—unlike Keillor's gray, sour, and dour outcropping of Mist County bedrock.

10. Had the Debtor bought the house, not filed for bankruptcy, and died when and as he did, he would have retained a place to live in comfort and dignity. Olson's rights, however, would not have been prejudiced; the house would have been administered in probate, Olson's claim could have been allowed as appropriate, and Olson would have received distribution from the probate estate as a creditor, at a priority higher than the Debtor's devisees.

In so many words, then, this Court infers that the Debtor acted with actual "fraudulent intent." His purchase of 200 Summer Avenue, then, equates to a fraudulent transfer under Minnesota statute. Under *Tveten* this defeats the Debtor's claim of homestead exemption. The issue for which the Eighth Circuit remanded this case has the same outcome as before:

IT IS HEREBY ORDERED AND DETERMINED:

1. The Trustee's objection is sustained.

2. The Debtor's interest in the following described real estate located in Steele County, Minnesota:

Lot 8, Block 2, Eastgate No. 2, City of Owatonna, Steele County, Minnesota,

is not exempted from the estate in this case by operation of MINN.STAT. § 510.01, *et seq.*, remains property of that estate, and shall be administered by the Trustee in due course.