**In re John Stacy SIMMS, III and Cledith A. Simms, Debtors.**

**Bankruptcy No. 99–33875–BKC–SHF.**

United States Bankruptcy Court, S.D. Florida, West Palm Division.

Jan. 5, 2000.

Thomas D. DeCarlo, West Palm Beach, FL, for debtors.

Michael R. Bakst, West Palm Beach, FL, for trustee.

## ORDER OVERRULING OBJECTION TO EXEMPTIONS

STEVEN H. FRIEDMAN, Bankruptcy Judge.

THIS MATTER came on to be heard on December 7, 1999, upon the Trustee's Objection to Exemptions. The Trustee objects to the claimed exemption in a USG Annuity & Life Company annuity (the "Annuity") valued at $67,467.57, and in the alternative, the Trustee objects to the claimed homestead exemption in property located at 5885 NE Third Lane, Okeechobee, Florida (the "Okeechobee property"). The Objection alleges that the Debtors transferred $65,467.57 in proceeds from the sale of their former homestead into the purchase of the Annuity with intent to hinder, delay, and defraud creditors in violation of Florida Statutes §§ 726.105, 726.108, 222.29, and 222.30. Finding that the Trustee has failed to meet his burden of proving non-entitlement, the Court overrules the Objection as to both exemptions.

Prior to January 29, 1999, the Debtors resided at 1802 Montague Street, Lake Worth, Florida (the "Lake Worth property"), and used the Okeechobee property, which they had purchased in 1995, for recreational purposes. During the summer of 1998, the Debtors decided to sell the Lake Worth property and establish the Okeechobee property as their permanent residence. Their decision was based on several factors: Mrs. Simms was unhappy living in Palm Beach County because of the congestion and the "concrete;" Mrs. Simms was in poor health, and her doctor suggested the move might be good for her; and, Mrs. Simms' elderly father, whom she cared for, lived in Okeechobee. The Debtors placed the Lake Worth property on the

real estate market in September 1998 and closed a sale of the property on January 29, 1999. After paying off the mortgage, there remained a balance in sale proceeds of $65,467.57, in the form of a check from the real estate title company serving as the closing agent. The Debtors neither deposited nor cashed the check but endorsed the check in favor of USG Annuity and Life Company in exchange for the Annuity, after meeting with the company's president, Richard Flah, on February 1, 1999.

Both Debtors are employed by John S. Simms, Inc., a janitorial services corporation of which Mr. Simms is the sole shareholder. When Mrs. Simms was healthy, both Debtors worked as janitors, cleaning the various professional office buildings that comprised the corporation's clientele. In March of 1999, Mrs. Simms' health declined sharply, and she was no longer able to work. As a result, the corporation lost seven accounts, which represented a significant percentage of its business. The Debtors decided to file bankruptcy in late April or early May and filed their joint Chapter 7 petition on August 4, 1999.

The Trustee contends that the Court should deny the claimed exemption in the Annuity because it was acquired via conversion of a non-exempt asset with intent to defeat the interests of creditors. Citing *Orange Brevard Plumbing & Heating v. La Croix*, 137 So.2d 201 (Fla.1962), the Trustee argues that the $65,467.57 check the Debtors received from the title company was subject to execution because there was no intention to reinvest the funds in a new homestead. In *Orange Brevard*, judgment debtors sold their homestead two months after a creditor recorded a $5,972.18 judgment lien against them. *See id.* Counsel for the purchaser of the homestead property, having discovered the judgment lien, withheld $6,000 of the purchase price pending determination that the property was in fact homestead as of the date of closing. *See id.* The creditor subsequently obtained a writ of garnishment

against the purchaser's counsel, and the debtors filed a motion to dissolve the writ, arguing that the $6,000 was exempt from forced levy because it represented proceeds from sale of homestead property. *See id.* at 201–02. The debtors filed an affidavit in support of their motion, stating that they intended to purchase a home with the contested $6,000. *See id.* at 202. The circuit court dissolved the writ, finding the proceeds from sale of the homestead were exempt under Florida law. *See id.*

The Supreme Court of Florida framed the issue on appeal as whether exemption of homestead property "extends also to the proceeds of a voluntary sale of a homestead when it is intended in good faith that such proceeds are to be [reinvested] in a new homestead." *Id.* at 203. The court offered an extensive analysis of the existing case law on this issue, noting that the majority rule dictated homestead sale proceeds are not exempt. *See id.*, 204–06. The court rejected the majority rule, however, based on its commitment to a liberal interpretation of the Florida homestead exemption. *See id.* at 206. The language of the opinion clearly indicates that the exemption of homestead proceeds is conditioned on the intention to reinvest in another homestead, as distinguished from other exempt assets:

> [W]e hold the proceeds of a voluntary sale of a homestead to be exempt from the claims of creditors just as the homestead itself is exempt if, and only if, the vendor shows, by a preponderance of the evidence an abiding good faith intention prior to and at the time of the sale of the homestead to reinvest the proceeds thereof in another homestead within a reasonable time. Moreover, only *so much* of the proceeds of the sale as are intended to be reinvested in another homestead may be exempt under this holding.

*Id.* (emphasis in original).

If the Debtors in the instant case had held the subject funds for investment in a

new homestead, the funds clearly would be exempt under *Orange Brevard.* The initial issue before this Court is whether the same rule applies where the Debtors held the funds for investment in an exempt asset other than homestead. The Court determines that it does not.

■ The Debtor cites cases from other jurisdictions for the proposition that "rolling over" proceeds of one exempt asset into another exempt asset is permissible as a matter of law. *See Love v. Menick,* 341 F.2d 680 (9th Cir.1965); *In re Cottrill,* 118 B.R. 535 (Bankr.S.D.Ohio 1990). The Court has reviewed the cases cited by the Debtor and finds them persuasive. The voluntary liquidation of an exempt asset and subsequent reinvestment in another exempt asset should be considered permissible per se because such a maneuver neither harms creditors nor changes their position vis-a-vis the debtor. However, as directed by the Eleventh Circuit Court of Appeals, "[T]he bankruptcy court must interpret and apply the Florida exemption law in the same manner as a Florida state court." *In re Colwell,* 196 F.3d 1225, 1226 (11th Cir.1999). The Florida Supreme Court has held that homestead proceeds retain their exempt status only if the proceeds are rolled over into another homestead. *See Orange Brevard,* 137 So.2d at 206.

■ Pursuant to *Orange Brevard,* the $65,467.57 net sale proceeds of the Lake Worth property constituted a non-exempt asset because the Debtors had no intention of reinvesting the proceeds in another homestead. Thus, the remaining issue before the Court is whether the Debtors' act of converting these non-exempt funds into an exempt annuity was done with intent to hinder, delay, and defraud creditors in violation of Florida Statutes §§ 726.105, 726.108, 222.29, and 222.30. As noted by Judge Proctor, "[T]he conversion of non-exempt assets into exempt assets is not fraudulent per se; however, when the conversion is done with intent to defeat the interests of creditors, it may be sufficient

to deny a debtor's claim of exemption." *In re Wilbur,* 206 B.R. 1002, 1008 (Bankr. M.D.Fla.1997) (*citing In re Mackey,* 158 B.R. 509, 512 (Bankr.M.D.Fla.1993); *In re Elliott,* 79 B.R. 944, 946 (Bankr.M.D.Fla. 1987)). The party objecting to the exemption must prove by a preponderance of the evidence that the debtor harbored the requisite intent, *see id.* at 1006 (*citing In re Rightmyer,* 156 B.R. 690, 692 (Bankr. M.D.Fla.1993)), which may be inferred from extrinsic evidence. *See id.* at 1008 (*citing Mackey,* 158 B.R. at 512; *Elliott,* 79 B.R. at 946). "Two important indicators of fraudulent intent are the timing of the conversion from non-exempt to exempt property and any attempts by [the] debtor to conceal the conversion." *Mackey,* 158 B.R. at 512 (*citing, e.g., Norwest Bank Nebraska, N.A. v. Tveten,* 848 F.2d 871 (8th Cir.1988); *In re Schwarb,* 150 B.R. 470 (Bankr.M.D.Fla.1992); *In re Johnson,* 124 B.R. 290 (Bankr.D.Minn.1991)).

■ The Court finds that the Trustee in the instant case failed to meet his burden of proving that the conversion resulting in purchase of the Annuity was done with intent to hinder, delay, or defraud creditors. Furthermore, the Trustee has failed to establish any factual basis for denying the Debtors' homestead exemption in the Okeechobee property. The record reflects that the Debtors decided in the summer of 1998, a full year before filing bankruptcy, to sell the Lake Worth property and establish the Okeechobee property as homestead. Their reasons for doing so were legitimate, compelling, and independent of any alleged scheme to defraud creditors. After closing on the Lake Worth property and transferring homestead to the Okeechobee property, the Debtors were left with $65,467.57 in net sale proceeds. Had they wished to shield these funds from creditors, they could have invested them in their new homestead with no fear of reprisal. *See Orange Brevard,* 137 So.2d at 206. However, the Debtors were concerned about their advancing ages and about Mrs. Simms' ill-

ness and were therefore interested in a long-term investment. They had some money invested in individual retirement accounts, but Mr. Simms testified these investments were performing very poorly and that he was very worried about the couple's financial future. Richard Flah testified that the Debtors told him of their needs and concerns and that Mr. Flah recommended an annuity as the most appropriate investment. Having considered the evidence, the Court finds that the Debtors' reasons for purchasing the Annuity were legitimate.

Of course, the Debtors could have used the $65,467.57 to substantially pay their accumulated unsecured debts of $89,-213.28, consisting of credit card obligations and medical expenses. It is likely that neither the Annuity nor any other investment could have yielded a return sufficiently high to enable the Debtors to pay all of the interest accruing on these unsecured debts, with credit card companies typically charging interest in excess of 18%. However, such an apparently unwise financial decision can hardly justify an inference of fraud. In these days of ultra-easy credit, wherein credit card companies flood mailboxes daily with solicitations, enticing consumers to incur ever-increasing levels of debt, it has become the norm for much of our populace to carry excessive amounts of consumer debt.[1]

Indeed, the Trustee offered no evidence to indicate that the Debtors did not intend to pay off their consumer debt after purchasing the Annuity in February. Nothing in the record suggests that any creditors had begun serious collection efforts at that time, and there is no evidence that the Debtors attempted to conceal the conversion resulting in purchase of the Annuity. The record reflects that the Debtors continued paying most of their creditors until March, when Mrs. Simms' health took a sharp decline. The Debtors testified that it was this unforeseen event that led them in late April or early May to consider, for the first time, filing bankruptcy. Had Mrs. Simms' health not taken a sharp decline, the Debtors might well have continued paying their creditors and remained out of bankruptcy.

It does appear unjust that, as a result of the vagaries of Florida's liberal exemption laws, Florida residents owing tens of thousands of dollars can avoid payment of their obligations by availing themselves of the protection afforded by Florida's myriad of exemptions.[2] Nonetheless, absent legislative intervention, Florida judges, both state and federal, shall have no choice but to struggle in their endeavors to apply Florida's exemption laws with consistency.

For the foregoing reasons, it is hereby

ORDERED that the Trustee's Objection to Exemptions is overruled.

---

**1.** As of mid–1999, the volume of consumer debt in the United States exceeded $1.32 trillion. *Consumers Chip Away at Debt Mountain*, WALL ST. J., MAY 24, 1999, at A2.

**2.** In addition to homesteads and annuities, Florida exempts wages of the head of a family, cash surrender values of life insurance policies, pension plans, individual retirement accounts, tenancy by the entireties property (immune from execution by creditors of one of the joint tenants in a tenancy by the entireties), certain types of government benefit plans, etc.